FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 JAN 31  PM 12: 05

U.S. DISTRICT COURT
N.D. OF ALABAMA

JOHN ROBERT CULPEPPER and        )
PATRICIA STARNES CULPEPPER,      )
                                 )
        Plaintiffs,              )
                                 )
v.                               )        CV96-H-917-S
                                 )
INLAND MORTGAGE CORPORATION,     )
                                 )
        Defendant.               )

ENTERED

JAN 3 1 1997

## MEMORANDUM OF DECISION

Presently before the Court is the November 26, 1996 motion
for summary judgment filed by defendant, Inland Mortgage
Corporation.  Pursuant to the Court's December 2, 1997 Order, the
motion was deemed submitted, without oral argument, on January
10, 1997.  On January 17, 1997, Inland filed motions requesting
leave to amend its evidentiary submission and requesting leave to
file a reply brief.  The Court granted both of these motions on
January 21, 1997.  In addition, on January 21, 1997, the Court
entered an Order requesting a document from the parties that was
omitted from Inland's evidentiary submission.

## I. Procedural History

Plaintiff John and Patricia Culpepper commenced this action
by filing a complaint in this Court on April 11, 1996.  The
complaint alleged that Inland had violated the Real Estate

26

Settlement Procedures Act of 1974 ("RESPA") in two ways: (1) by paying an impermissible "referral fee" or "kickback" to the Culpeppers' mortgage broker, Premiere Mortgage Company, and (2) by failing to disclose certain charges on the HUD-1 statement. The complaint sought class certification of its claims under Rule 23(b)(3), Fed. R. Civ. P.

A scheduling conference was held on August 12, 1996, and by an Order entered the following day, the Court acknowledged that plaintiffs' counsel had stated at the conference that plaintiffs did not intend to pursue any claim based on the failure to disclose information on the HUD-1 form. Rather, as the Court's Order notes, plaintiffs' counsel indicated that the only claim to be litigated was whether Inland's payment of a "yield spread premium" to Premiere was a "kickback" in violation of 12 U.S.C. § 2607(a). Plaintiffs filed a motion for leave to amend their complaint to delete any reference to a disclosure-based claim shortly thereafter, which motion was granted by the Court on December 2, 1996.[1]

Also at the August 12, 1996 scheduling conference, the defendants expressed a desire to test the sufficiency of plaintiffs' individual claims before any decision was made on the class certification issue. The Court agreed to this course of

---

[1]Apparently, plaintiffs never actually filed an amended complaint, but the parties have proceeded under the assumption that the only claim remaining in the case is plaintiffs' § 2607 claim.

2

action, and stayed discovery on class certification issues
pending the resolution of Inland's motion for summary judgment.
See August 13, 1996 Order.

## II. Standards for Evaluating a Summary Judgment Motion

Under Fed.R.Civ.P. 56(c), summary judgment is proper "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The
party asking for summary judgment always bears the initial
responsibility of informing the court of the basis for its
motion, and identifying those portions of the pleadings or
filings, which it believes demonstrate the absence of a genuine
issue of material fact. Celotex, 477 U.S. at 323. Once the
moving party has met his burden, Rule 56(e) requires the
nonmoving party to go beyond the pleadings and by his own
affidavits, or by the depositions, answers to interrogatories,
and admissions of file, designate specific facts showing that
there is a genuine issue for trial. Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material
and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477
U.S. 242, 248 (1986). All reasonable doubts about the facts and

all justifiable inferences are resolved in favor of the non-
movant. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th
Cir. 1993). A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson, 477 U.S. at 248. If the evidence is merely colorable,
or is not significantly probative, summary judgment may be
granted. Id. at 249.

The method used by the party moving for summary judgment to
discharge its initial burden depends on whether that party bears
the burden of proof on the issue at trial. See Fitzpatrick, 2
F.3d at 1115-17 (citing United States v. Four Parcels of Real
Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the
moving party bears the burden of proof at trial, then it can only
meet its initial burden on summary judgment by coming forward
with positive evidence demonstrating the absence of a genuine
issue of material fact; i.e. facts that would entitle it to a
directed verdict if not controverted at trial. Fitzpatrick, 2
F.3d at 1115. Once the moving party makes such a showing, the
burden shifts to the non-moving party to produce significant,
probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at
trial, it can satisfy its initial burden on summary judgment in
either of two ways. First, the moving party may produce
affirmative evidence negating a material fact, thus demonstrating

4

that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, _____ U.S. ____, 116 S.Ct. 2175 (1996).

5

## III. Relevant Undisputed Facts

The parties agree on all of the relevant facts in this case, although they naturally draw contrary legal conclusions from those facts. Inland Mortgage Corporation is a mortgage lender and servicer based in Indianapolis, Indiana. Premiere Mortgage Company is a Birmingham, Alabama mortgage broker. (Blankensopp Aff.). By an agreement dated March 15, 1994, Premiere and Inland agreed that, from time to time, Inland would purchase loans originated by Premiere. (Id., Ex. U). Premiere, however, would not furnish the capital for these loans; instead, Premiere would "register" loans with Inland, and Inland would supply the loan proceeds to Premiere. (Id.).[2] After the loan was consummated, Premiere would then be obligated to deliver the loan "package" to Inland, including the promissory note, mortgage, evidence of insurance, and assignments of all rights Premiere held. (Id.). The contract further provided that Inland would compensate Premiere for these loan purchases in accordance with Inland's

---

[2]The parties agree that this arrangement is known as "table funding," and that it was not a "secondary market transaction" exempt from the requirements of RESPA. See 24 C.F.R. § 3500.2. The "table funding" of loans simply absolved Inland from having to compensate Premiere for the use of Premiere's capital; if Premiere had closed loans using its own capital, any sale of the loans would have included a fee for the use of that capital. The "table funding" arrangement was thus beneficial to both parties -- to Premiere because it did not have to raise the capital and to Inland because it could likley obtain capital more cheaply than Premiere could.

6

"Pricing Policy and Procedures." (Id.).[3]

Inland's "Pricing Policy and Procedures" recited that Inland would distribute "established daily prices" each day at 11:00 a.m. Eastern time, and that it would continue to honor those prices until 9:30 a.m. the following day. (Defendant's 1/30/97 Notice of Filing Evidentiary Materials).

In keeping with its contracts with Premiere and other mortgage brokers, Inland released daily price sheets showing the "prices" it was willing to pay for various loans. (Acree Aff.). The "price" was expressed as a percentage of the loan amount, and was influenced by factors such as the type of loan, the "lock-in" period, and the interest rate on the loan. (Id.). For a loan of "par value," Inland paid nothing to the broker; for "below par"

---

[3]Paragraph 1 of the Inland-Premiere "Loan Purchase Agreement" attached as Exhibit U to the Blankensopp affidavit, reads in relevant part as follows:

> 1. **Commitment to purchase loans.** Seller may from time to time register loans with the marketing department of Inland for eventual sale to Inland. The price to be paid for any loans so registered, the time period during which Inland honors a given price, and all other issues related to the pricing of loans will be determined by Inland's Pricing Policy and Procedures, a copy of which is attached to this agreement and incorporated into this agreement by this reference .... By accepting registration of a loan, Inland agrees to purchase said loan from seller, provided that the price and delivery of the loan complies with Inland's pricing policy and all provisions of this agreement and the Inland Wholesale Lending Manual ....

7

loans, Inland required the broker to pay "discount points" to Inland; and for "above par" loans, Inland paid the broker a "yield spread premium." (Id.). The undisputed evidence in the record indicates that Inland's prices were set by market forces, such as the cost of capital, competitors' prices, and other economic factors. (Id.).

The Culpeppers contacted Premiere on October 30, 1995, to inquire about the possibility of obtaining a mortgage loan through Premiere. (Blankensopp Aff.). The Culpeppers went through the loan application process, and later found a home to purchase. (Id.). On December 7, 1995, the Culpeppers chose to "lock in" the 7.5% interest rate that Premiere was offering at that time. (Id.).[4] On that same day, Premiere "registered" the Culpeppers' loan with Inland. (Id.). The loan closed on December 15, 1995, and Premiere acted as the lender during closing. (Id.). Shortly after the loan closing, Premier, in accordance with its contract with Inland, executed assignments of the Culpeppers' note and mortgage to Inland. (Id., Exs. W & X).

The HUD-1 statement given to the Culpeppers at the closing showed that the Culpeppers paid Premiere a 1% origination fee ($760.50) for Premiere's services. (Acree Aff., Ex. B). In addition, Premiere received a $1263.61 "yield spread premium"

---

[4]The Blankensopp Affidavit establishes as undisputed fact that the 7.5% rate obtained by the Culpeppers was a competitive market rate for a loan like the Culpeppers' in the Birmingham area market on December 7, 1995.

from Inland, which was also disclosed on the HUD-1 form.  (Id.).

The amount of the yield spread premium was calculated as follows:

consulting Inland's price sheet for December 7, 1995 (the

Culpeppers' "lock-in" date), under the category "Government

Products -- 30 year fixed," the Culpeppers' loan was a 7.5% loan

with a 15-day "lock-in" period, yielding a figure of -1.375.

(Acree Aff., Ex. A).  An additional .25 was subtracted, due to

the fact that the amount of the Culpeppers' loan exceeded

$50,000.  (Id.).  Adding these figures yielded

-1.625, which was the percentage yield spread premium Inland paid

to Premiere.  (Id.).[5]

## IV. Applicable Substantive Law and Analysis

The Real Estate Settlement Procedures Act of 1974 ("RESPA"),

among other things, prohibits providers of "settlement services"

from paying "referral fees" or "kickbacks":

> No person shall give and no person shall
> accept any fee, kickback, or thing of value
> pursuant to any agreement or understanding,
> oral or otherwise, that business incident to
> or a part of a real estate settlement service
> involving a federally related mortgage loan
> shall be referred to any person.

12 U.S.C. § 2607(a).  Although the funding and origination of

---

[5]The Culpeppers' loan amount was $77,761.00.  Multiplying
that figure by 1.625% produced a yield spread premium of
$1,263.61.

mortgage loans was not originally a "settlement service" as defined by RESPA, a 1992 amendment made it clear that such activities were "settlement services" subject to the Act's requirements. See 12 U.S.C. § 2602(3).

Here, the Culpeppers' claim is that the yield spread premium paid by Inland to Premiere was a "referral fee" proscribed by § 2607(a). In other words, the Culpeppers argue that Inland paid Premiere the yield spread premium in exchange for Premiere "referring" the Culpeppers' loan to Inland, so that Inland could provide the "settlement service" of funding the loan.

Inland argues, by contrast, that the yield spread premium was simply the market-driven payment to Premiere for an asset -- the loan itself. Inland relies on an exception to § 2607(a), which reads as follows:

> Nothing in this section shall be construed as prohibiting ... (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.

12 U.S.C. § 2607(c). Inland characterizes the yield spread premium as "payment for goods," that is, the purchase price of the Culpeppers' loan.

In determining whether the yield spread premium was an illegal "referral fee" or a permissible "payment for goods," the Court looks to the interpretation of RESPA provided by Regulation X, 24 C.F.R. part 3500. Plaintiffs argue that the yield spread

10

premium paid by Inland to Premiere was an inducement designed to influence Premiere's selection of Inland for the funding of the Culpeppers' loan. Plaintiffs in particular point to the definition of "agreement or understanding" contained in 24 C.F.R. § 3500.14(e): "[w]hen a thing of value is received repeatedly and is connected in any way with the volume or value of the business referred, the receipt of the thing of value is evidence that it is made pursuant to an agreement or understanding for the referral of business" (emphasis added). Tracking this regulatory language, plaintiffs argue that, because the yield spread premium was tied to the value of the Culpeppers' loan to Inland, it was a referral fee as proscribed by § 2607.

Plaintiffs' argument, although superficially appealing, does not withstand scrutiny, because the undisputed evidence in the record indicates that the premium paid to Premiere was a market-driven purchase price that Inland paid for the Culpeppers' loan. See Acree Aff. This purchase price was no more a "referral fee" that induced Premiere's selection of Inland than any other purchase price induces a seller to part with property in exchange for money. In fact, because the record here indicates without dispute that the yield spread premium was reflection of the fair market value of plaintiffs' loan, it meets the test enunciated in Regulation X for determining whether a fee is a payment for purchase of goods or services: "[i]f the payment ... bears no reasonable relationship to the market value of the goods or

11

services provided, then the excess is not for services or goods actually performed or provided." 24 C.F.R. § 3500.14(g)(2).[6] There is also no dispute on the record that Premiere, wholly apart from the settlement services it provided the Culpeppers, created a valuable asset for Inland, and the payment from Inland to Premiere reflected the value of that asset. Because the only payment from Inland to Premiere, as a matter of undisputed fact, was a fair market price for the Culpeppers' loan, there is no "excess" payment left to be attributed to a "referral fee."

Plaintiffs argue, however, that the yield spread premium cannot be a payment for the purchase of a loan, because Inland would be obligated to pay nothing for "buying" a par or below-par loan. Plaintiffs' argument misunderstands the consideration flowing from Inland to Premiere by viewing the yield spread as the only consideration given to Premiere. First and foremost among the consideration furnished to Premiere by Inland is Inland's promise to provide capital for Premiere to lend and Inland's promise to take on loans generated by Premiere. Without a doubt, these promises are extremely valuable to Premiere, because the availability of capital and a lender willing to

---

[6]The Court notes that whether Premiere requires borrowers to pay to it any amount it will owe to Inland when a loan is below par, and whether Premiere passes along to the borrower any yield spread premium it receives for an above-par loan, are irrelevant to the decision that, in either case, the purchase price for the loan is totally determined by market forces. In other words, Premiere's disposition of the yield spread has no bearing on the issue of how to characterize the payment from Inland to Premiere.

purchase loans make Premiere's operation possible. More importantly, as a broker representing borrowers, Premiere is entitled to charge home buyers fees for its services -- origination fees, fees for appraisals, and the like. Inland's commitment to purchase loans and supply capital thus makes it possible for Premiere to do business and make a profit from its borrower customers. This commitment of capital by Inland is thus the primary consideration or "purchase price" for loans generated by Premiere, and the discount points or yield spread premiums simply adjust that consideration upward or downward based on the loan's fair market value at the time it is "registered."[7] Viewed in this context, it is clear that the price sheets' entries regarding discount points and yield spread premiums for loans above and below par is simply an adjustment to the overall consideration Inland gives to Premiere for the purchase of loans generated by Premiere.

To conclude, on the undisputed facts of this case, the yield spread premium paid by Inland to Premiere was a fair market value paid to Premiere in exchange for Premiere's creation of the Culpepper loan and sale of that loan to Inland. Although the yield spread premium could fit within the definition of a referral fee, it also undoubtedly fits within the definition of a permitted "payment for goods" under § 2607(c)(2). By the

---

[7]See supra footnote 5.

13

structure of the statute itself, the specific exceptions to liability contained in § 2607(c) override the general prohibitory language contained in § 2607(a). Thus, even if plaintiffs are correct that the yield spread premium technically falls within the definition of a "referral fee," the more specific exception for "payment for goods" in § 2607(c) renders the premium permissible as a matter of law. Inland's motion for summary judgment is due to be granted, and an Order to that effect will be entered.[8]

Also pending before the Court is the January 15, 1997 motion for class certification filed by plaintiffs. At defendants' request, the Court delayed reaching the class certification issue until after the resolution of the present motion for summary judgment. The Court believes that, in this case, it is proper to enter judgment on defendant's behalf and simply dismiss the class

---

[8]The Court acknowledges that it reaches a different result than some other courts that have addressed the permissibility of yield spread premiums under RESPA. In Mentecki v. Saxon Mortgage, Inc., No. 96-1629-A (E.D. Va. Jan. 10, 1997), the Court denied a 12(b)(6) motion in a yield spread case brought under RESPA. However, the present case differs from Mentecki in two respects: (1) here, there was an unrebutted evidentiary showing that the yield spread was determined by market forces, and (2) here, unlike in Mentecki, defendant argues that the yield spread premium was a payment for the broker's sale of loans to the lender. No such argument was addressed in Mentecki. In addition, the Court notes that Judge Ryskamp, in Martinez v. Weyerhauser Mortgage Co., No. 94-1610 (S.D. Fla. Aug. 30, 1996), denied a motion for summary judgment filed by defendants in yet another RESPA yield spread case. However, Martinez, like Mentecki, did not address the argument that a yield spread premium is part of the payment a lender makes for the purchase of loans. Thus, neither Mentecki nor Martinez are presuasive here.

14

allegations without prejudice.  The absent class members certainly suffer no prejudice from this course of action -- since no class was ever certified, the absent class members are not bound by this judgment and remain free to bring their own claims to court.  And, given the Court's holding that plaintiffs' claims fail as a matter of law, the only party (other than the Culpeppers) to suffer prejudice is the defendant, who loses the opportunity to obtain a favorable judgment against the entire class.  However, since Inland asked for this treatment, the prejudice it suffers will not be considered.  In addition, delaying the massive cost associated with discovery and administration of a class action until after the named plaintiffs' claims survive a motion for summary judgment serves to eliminate unnecessary costs to the Court and the parties.  In these circumstances, the Court exercised its discretion to delay the class certification issue.  And, now that the Court has determined that Inland is entitled to judgment as a matter of law, the fairest course is simply to dismiss the class allegations without prejudice.  Thus, plaintiffs' January 15, 1997 motion for class certification will be denied.

DONE this _____$31\frac{st}{}$_____ day of January, 1997.

SENIOR UNITED STATES DISTRICT JUDGE

15